IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 24-cv-01117-PAB-STV

PREMARK HEALTH SCIENCE, INC., a Texas corporation,

Plaintiff,

v.

BRAD PYATT, an individual,

Defendant.

---

**FINDINGS OF FACT AND JUDGMENT**

---

On April 28, 2026, the Court presided over a bench trial involving plaintiff

Premark Health Science, Inc. ("Premark") and defendant Brad Pyatt. The Court has

jurisdiction pursuant to 28 U.S.C. § 1332.

The trial involves two claims brought by Premark. First, Premark alleges that Mr.

Pyatt, the founder of defendant PlantFuel, Inc. ("PlantFuel")[1], is liable for PlantFuel's

breach of contract between Premark and PlantFuel. *See* Docket No. 84. Second,

Premark alleges that Mr. Pyatt, in his personal capacity, is liable for unjust enrichment.

*See id.* At trial, Premark called two witnesses: Scott Steinford, Premark's current CEO,

and Mr. Pyatt. On April 29, 2026, at the conclusion of Premark's case-in-chief, the

Court granted Mr. Pyatt's oral motion for judgment pursuant to Federal Rule of Civil

---

[1] PlantFuel has not appeared in this action. Premark has filed a motion for
default judgment against PlantFuel. *See* Docket No. 85.

Procedure 52(c).  *See* Docket No. 95.  The Court's findings of fact and conclusions of law are as follows:

## I.    FINDINGS OF FACT

### A.  <u>Stipulated Facts</u>

The parties stipulated to the following facts for purposes of trial:

1. Mr. Pyatt is recognized as an expert in marketing and branding nutritional products.

2. Mr. Pyatt and his partners at Colby Capital purchased the "PlantFuel" brand from TRUBrands through the entity Tasty Idea, LLC ("Tasty").

3. Colby Capital provided the entirety of the $310,000 used to purchase the brand from TRUBrands.

4. Mr. Pyatt and Colby Capital formed PlantFuel in Delaware in August 2019.

5. The "PlantFuel" brand was transferred from Tasty to the Delaware company, PlantFuel.

6. Sire Biosciences and PlantFuel entered into a Share Exchange Agreement.

7. Mr. Pyatt entered a revolving loan agreement with PlantFuel Life, Inc. ("PFL").[2]  There is no such agreement with PlantFuel.

8. PlantFuel is a wholly owned subsidiary of PFL.

9. Premark contracted with PlantFuel.

10. Purchase orders between Premark and PlantFuel began in May 2021.

---

[2] PFL owned PlantFuel and was based in Canada.

11. Premark provided products and services to PlantFuel valued at $433,881.58 for which Premark has not received payment.  Mr. Pyatt was PlantFuel's sole employee at its founding in 2020 and at its conclusion in 2023.

12. Mr. Pyatt received the invoices for Premark's products.

13. Mr. Pyatt occasionally reimbursed himself through PlantFuel for "things like dinners."

14. In addition to payments of Mr. Pyatt's salary, Mr. Pyatt and PlantFuel engaged in the following transactions:

| Direct transfers between PlantFuel Inc and Brad Pyatt | | | |
|---|---|---|---|
| Date | Amount | From | To |
| 3/30/20 | $11,557.28 | "Wire Transfer" | Brad |
| 7/7/20 | $85,000.00 | "Wire Transfer" | Brad |
| 7/8/20 | $5,326.05 | "Wire Transfer" | Brad |
| 7/14/20 | $20,000.00 | Brad | "Wire Transfer" |
| 7/20/20 | $70,000.00 | Brad | "Wire Transfer" |
| 8/7/20 | $4,974.50 | "Wire Transfer" | Brad |
| 9/4/20 | $4,974.50 | "Wire Transfer" | Brad |
| 10/2/20 | $4,974.50 | "Wire Transfer" | Brad |
| 11/2/20 | $4,974.50 | "Wire Transfer" | Brad |
| 11/24/20 | $1,562.50 | "Wire Transfer" | Brad |
| 12/3/20 | $4,974.50 | "Wire Transfer" | Brad |
| 12/10/20 | $1,562.50 | "Wire Transfer" | Brad |
| 1/11/21 | $8,072.00 | "Wire Transfer" | Brad |
| 2/12/21 | $1,000.00 | Brad | PlantFuel |
| 3/3/21 | $4,974.50 | "Wire Transfer" | Brad |
| 3/4/21 | $2,500.00 | Brad | PlantFuel |
| 3/22/21 | $4,000.00 | "Wire Transfer" | Brad |
| 4/28/21 | $10,000.00 | PlantFuel | Brad |
| 6/24/21 | $10,000.00 | PlantFuel | Brad |
| 7/26/21 | $10,000.00 | PlantFuel | Brad |
| 7/30/21 | $4,947.50 | "Wire Transfer" | Brad |
| 8/27/21 | $7,500.00 | PlantFuel | Brad |
| 10/1/21 | $10,000.00 | "Wire Transfer" | Brad |
| 10/27/21 | $100,000.00 | "Wire Transfer" | Brad |
| 2/21/22 | $18,000.00 | "Wire Transfer" | Brad |
| 3/2/22 | $4,312.34 | "Wire Transfer" | Brad |

| 3/9/22 | $16,000.00 | "Wire Transfer" | Brad |
| 3/13/22 | $7,244.94 | "Wire Transfer" | Brad |
| 5/19/22 | $14,811.93 | "Wire Transfer" | Brad |
| 9/8/22 | $265,178.55 | "Wire Transfer" | Brad |
| 9/9/22 | $250,000.00 | Brad | "Wire Transfer" |
| 9/22/22 | $9500.00 | Brad | "Wire Transfer" |

15. Neither PlantFuel nor Mr. Pyatt fully paid Premark for the products, leaving eight of the invoices – which are related to the purchase orders – unpaid.

16. PlantFuel and Premark did business with each other from May 2021 through December 2022 in Colorado.

17. Mr. Pyatt filed paperwork with the Colorado Secretary of State on March 31, 2022 to get PlantFuel authorized to do business in Colorado.

18. On July 31, 2023, the Colorado Secretary of State changed PlantFuel's status to "delinquent" because the annual-reporting paperwork was not filed.

19. Mr. Pyatt resigned as CEO and CFO of PFL in April 2023.

20. At the time that Mr. Pyatt left PFL, it had no assets other than inventory, it was not generating cash, its stock was worthless, and it was not profitable.

21. PlantFuel currently has no employees or operations.

22. PlantFuel currently has no known assets.

**B. Findings of Fact from Trial Evidence**

Pursuant to Rule 52(a)(1) and (c), the Court makes the following findings of fact:

**a. Mr. Pyatt's Role with Tasty, PlantFuel, and PFL**

23. Mr. Pyatt was the CEO of PlantFuel, until it was purchased by PFL, at which point Mr. Pyatt became the CEO of PFL. Mr. Pyatt was the CFO of PlantFuel for a brief period of time in 2023.

4

24. Tasty, the entity that initially purchased the PlantFuel brand, is a sole proprietorship owned by Mr. Pyatt. PlantFuel and Tasty likely shared a physical address at some point. Mr. Pyatt would list his home address for his companies.

25. On August 23, 2022, PFL's board of directors passed a resolution wherein PFL entered into a revolving loan facility and security agreement. Exhibit A-39. Under the agreement, Tasty agreed to loan PlantFuel a principal sum of $1 million with an interest rate of 10% per annum and a maturity date of September 1, 2023. *Id.* Mr. Pyatt abstained from voting on the resolution due to his interest in the loan agreement. *Id.* The resolution did not indicate that there was a repayment program.

26. One of Mr. Pyatt's other companies, MusclePharm Corporation ("MusclePharm"), was the subject of a Cease-and-Desist Order by the Securities and Exchange Commission ("SEC"). Exhibit A-43. Mr. Pyatt was the respondent. *Id.* The SEC found that MusclePharm filed materially false and misleading documents with the SEC. *Id.*, p. 2. MusclePharm and PlantFuel shared some employees and investors.

27. Most of Mr. Pyatt's companies are in the nutrition-supplement market.

28. In June 2020, Tasty, John O'Rourke, Melechdavid Inc. Retirement Plan ("Melechdavid"), and Stetson Capital Investments ("SCI") entered into a Stockholder Agreement with PlantFuel. Exhibit A-28, p. Plaintiff-057. The Stockholder Agreement appointed Mr. Pyatt as President and CEO and Mr. O'Rourke as Secretary and Treasurer of PlantFuel. *Id.*, p. Plaintiff-057-58. Pursuant to the Stockholder Agreement, Mr. Pyatt held 5,000 shares of PlantFuel stock, Mr. O'Rourke and Melechdavid each held 1,667 shares of PlantFuel stock, and SCI held 1,666 shares of PlantFuel stock. *Id.*, p. Plaintiff-065.

5

29. On April 27, 2021, after PlantFuel entered into the Share Exchange Agreement with Sire Biosciences, Sire Biosciences changed its name to PFL.  Exhibit A-24.  On August 1, 2021, PFL's board of directors entered into an executive employment agreement with Mr. Pyatt.  Exhibit A-26, p. 1.  Pursuant to the employment agreement, Mr. Pyatt agreed to serve as PFL's CEO for an initial term of three years, to be renewed automatically for successive three-year terms.  *Id.*

30. PlantFuel managed operations in the United States.

31. Mr. Miller was the Chief Operating Officer ("COO") of PlantFuel and Chief Financial Officer ("CFO") at one point.  Sean McDougal was an additional employee.  Volod Ivanov was PlantFuel's CFO.

32. PFL had a board of directors and an audit committee.

33. After leaving PlantFuel in 2023, Mr. Pyatt worked for PlantFuel through a consulting agreement that lasted for 30 days, but he stopped receiving payment at some point.

### b.  PlantFuel's Purchase Orders with Premark

34. Premark is a manufacturing company that helps develop and produce nutritional and dietary products.  David Palmer was Premark's CEO from Premark's founding in 2007 until 2025.  Mr. Steinford became the CEO of Premark in 2025.  Anthony Bridges and Dennis Chau were accountants at Premark.

35. Brandon Sojka was a contractor for PlantFuel and introduced Mr. Pyatt to Premark representatives in 2021.

36. On May 7, 2021, Mr. Pyatt emailed PlantFuel's first purchase order to Mr. Bridges and Mr. Sojka.  Exhibit A-12.

37. On June 11, 2021, Mr. Pyatt sent PlantFuel's second purchase order for Premark's products to Mr. Sojka.  Exhibit A-13.  Mr. Sojka emailed the purchase order to Mr. Bridges and Mr. Chau.  *Id.*

38. On October 18, 2021, Mr. Sojka sent PlantFuel's third purchase order to Mr. Bridges.  Exhibit A-14.

39. PlantFuel requested products from Premark in order to support a deal that PlantFuel had with the company GNC.  Mr. Steinford understood that PlantFuel was working with Premark to fulfill PlantFuel's deal with GNC.

40. PlantFuel had approximately $2 million worth of purchase orders with Premark.  PlantFuel put down 50 percent of the purchase orders' value.

41. Premark did not deliver the full purchase orders and, as a result, PlantFuel was unable to fulfill its purchase orders with GNC.  Mr. Steinford was aware that Premark encountered difficulties during the manufacturing process that resulted in Premark's failure to timely fulfill the purchase orders from PlantFuel.

42. On November 10, 2021, Mr. Palmer emailed Mr. Pyatt, stating "[w]e need to know when the funds are being wired to pay for the past due invoices."  Exhibit A-19, p. Plaintiff-026.  Mr. Pyatt responded that "[w]e will get the past due payments processed by next week."  *Id.*

43. On April 19, 2022, Ed Love, Premark's CFO, emailed Mr. Pyatt regarding PlantFuel's unpaid invoices.  Exhibit A-17, p. Plaintiff-021.  That same day, Mr. Pyatt responded to Mr. Love, stating that he planned to meet with PlantFuel's CFO and would get back to Mr. Love and Mr. Palmer.  *Id.*, p. Plaintiff-020.

44. On April 21, 2022, Mr. Love emailed Mr. Pyatt and PlantFuel employees Volod Ivanov and Dana Ghadban to follow-up on the status of PlantFuel's payment. *Id.* Mr. Ivanov responded, "[w]e are working on the final tweaks during the next couple of days and will get back [sic] you by the beginning of next week." *Id.*

45. On August 10, 2022, Mr. Love emailed Mr. Pyatt regarding six open invoices that were not paid by PlantFuel. Exhibit A-18, p. Plaintiff-023-24. Mr. Palmer followed-up on this email on August 18, 2022, asking to meet in-person to discuss the status of the unpaid invoices. *Id.*, p. Plaintiff-023. Mr. Pyatt responded, asking if September 22 worked as a date for Mr. Love and Mr. Palmer to come to Denver. *Id.*, Plaintiff-022-23.

46. Premark sent PlantFuel products valued at $433,881.58 and PlantFuel did not pay the invoices associated with those products.

47. PlantFuel and Premark held negotiations regarding PlantFuel's obligation to pay the $433,881.58 in unpaid invoices, in light of Premark's failure to fulfill the purchase orders. Mr. Pyatt visited Premark with another PlantFuel employee in Texas at one point, where he discussed the payment issues with Premark.

### c.  Payments Received by Mr. Pyatt

48. PFL agreed to pay Mr. Pyatt a base salary of $150,000 for 2021, $250,000 for 2022, $300,000 for 2023, and $350,000 for 2024. Exhibit A-26, p. 1. PFL also agreed to pay Mr. Pyatt an annual incentive bonus of up to 125% of his annual base salary. *Id.* In addition to the salary and incentive bonus, Mr. Pyatt received interest payment on loans and payment from a consulting agreement with PFL in 2021. Mr. Pyatt does not recall what amount he received through his consulting agreement.

8

49. For the year 2021, Mr. Pyatt's W-2 Form from PlantFuel stated that he earned $25,000.  Exhibit A-30.  Mr. Pyatt was not certain why his W-2 did not reflect his $150,000 salary.

50. For the year 2022, Mr. Pyatt's W-2 from PlantFuel stated that he earned $195,780.49.  Exhibit A-31.

51. Mr. Pyatt received his salary in a variety of ways, such as by wire or through financial applications such as Zelle or Gusto.

52. In 2021, Mr. Pyatt received $172,994 in payments from PlantFuel.  He does not recall the reason for these payments.

53. In addition to payments from PlantFuel, in 2021, Mr. Pyatt received payments in various amounts that were sent through Gusto, Zelle, or by wire.  Exhibit A-36.  Mr. Pyatt does not recall the source of these payments.  Some of these payments originated from Tasty, but Mr. Pyatt does not recall which company was the source of these payments.

54. In 2022, Mr. Pyatt received $585,057.76 in payments from PlantFuel.  He does not recall the reason for these payments.

55. In addition to payment from PlantFuel, in 2022, Mr. Pyatt received payments in various amounts through Gusto, Zelle, or by wire.  Exhibit A-37.  Mr. Pyatt does not recall the source of these payments.  Some of these payments originated from Tasty, but Mr. Pyatt does not recall which company was the source of these payments.

56. In 2022, Mr. Pyatt received payments through Venmo that originated from another bank account of his.  *Id.*, p. 4, 5.  Mr. Pyatt does not recall the reason for these payments.

9

57. Mr. Pyatt would use PlantFuel's company credit card for expenses such as buying drinks and buying tickets for events.  Mr. Pyatt would take colleagues, employees, and vendors to such events.  It was typical for such expenses to lead to new business or investments for PlantFuel.  In December 2022, Mr. Pyatt made a $15,000 purchase for tickets to a national championship game, which Mr. Pyatt took a GNC representative to.

## II.    CONCLUSIONS OF LAW

### A.  Breach of Contract

For its first cause of action, Premark claims that it had contracts with PlantFuel whereby PlantFuel agreed to pay Premark for the products specified in the purchase orders.  *See* Docket No. 1 at 7, ¶¶ 23-27.  Premark claims that PlantFuel breached the contracts by failing to pay Premark $433,881.58 for the products that Premark sent to PlantFuel.  *See id.* at 5-6, ¶ 14.  Under Colorado law, Premark must establish four elements to make out a claim for breach of contract: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Spring Creek Expl. & Prod. Co. v. Hess Bakken Invs. II, LLC*, 887 F.3d 1003, 1033 (10th Cir. 2018) (quoting *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)). Premark must prove its breach of contract claim by a preponderance of the evidence. *See* Colo. Rev. Stat. § 13-25-127(1) ("Any provision of the law to the contrary notwithstanding . . . the burden of proof in any civil action shall be by a preponderance of the evidence.").

10

The evidence shows that Premark's contracts were with PlantFuel and that Mr. Pyatt was not a party to those contracts. Thus, while Premark proved by a preponderance of the evidence that PlantFuel breached its purchase order contracts with Premark, Premark failed to prove that Mr. Pyatt himself breached contracts he had with Premark. Nevertheless, Premark seeks to hold Mr. Pyatt liable on the theory that PlantFuel is the alter ego of Mr. Pyatt. The issue at trial was whether Premark proved by a preponderance of the evidence that the Court should pierce the corporate veil and hold Mr. Pyatt liable for PlantFuel's breach.[3]

There are two elements to a veil-piercing claim. *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *2-3 (Del. Ch. July 1, 2005). For the first element, a plaintiff must show that the defendant was an alter ego of the corporation. *Id.* Whether the defendant is an alter ego of the corporation turns on an inquiry that considers factors such as "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *PXP Producing Co. LLC v. MitEnergy Upstream LLC*, 342 A.3d 402, 417

---

[3] Delaware law controls whether the Court should pierce the corporate veil given that PlantFuel is a Delaware corporation. *See* Docket No. 65 at 9. In light of there being ambiguity as to whether a plaintiff must prove a veil-piercing claim by preponderance of the evidence or a higher standard, courts applying Delaware law have found it appropriate to apply the preponderance of the evidence standard in determining whether to pierce the corporate veil. *See, e.g.*, *NetJets Aviation, Inc. v. Perlman*, 2025 WL 2880153, at *3 (S.D. Ohio Oct. 9, 2025); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 318 (S.D. Tex. 2008). As discussed below, given that Premark fails to show by a preponderance of the evidence that it is proper to pierce the corporate veil, the Court need not decide whether a higher burden of proof applies.

(Del. Ch. 2025); *see also Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008).  No one factor is dispositive in this analysis. *PXP Producing Co.*, 342 A.3d at 417; *Mason*, 2005 WL 1653954, at *3.  For the second element, a plaintiff must show some aspect of fraud, injustice, or unfairness.  *PXP Producing Co.*, 342 A.3d at 417; *Mason*, 2005 WL 1653954, at *3.  Under Delaware law, "[v]eil piercing is a tough thing to plead and a tougher thing to get, and for good reason." *PXP Producing Co.*, 342 A.3d at 416.  "Delaware public policy does not lightly disregard the separate corporate form." *Id.* (internal quotations and citation omitted).  Courts in Delaware disregard the corporate form only in exceptional cases.  *Id.* at 416-17.

Premark makes the following arguments in support of its claim that PlantFuel is the alter ego of Mr. Pyatt.  First, Premark argues PlantFuel paid Mr. Pyatt before paying its creditors, like Premark.  Premark contends that the payments Mr. Pyatt received in 2021 and 2022, which exceed his salary under his employment agreement, are evidence that Mr. Pyatt was siphoning funds.  Premark also argues that the revolving loan agreement between Tasty and PlantFuel, which lacked a repayment program, was a means for Mr. Pyatt to siphon funds from PlantFuel.

The mere transfer of funds between PlantFuel and Mr. Pyatt, even while PlantFuel was unable to make payments to Premark, is not enough to support piercing the corporate veil.  Premark must "also show that such transfers were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans." *Harco Nat'l Ins. Co. v. Green Farms. Inc.*, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989); *see Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1522 (3d Cir. 1994), *aff'd,* 514 U.S. 938 (1995) ("Alter ego status cannot be inferred

12

whenever a shareholder withdraws some monies from a corporation without formally declaring a dividend or executing a note even if one of the withdrawals is made while the corporation is insolvent.").  Premark has presented no evidence indicating that the $172,994 in total payments Mr. Pyatt received from PlantFuel in 2021, or the $585,047.76 in total payments he received in 2022, was done to defraud Premark or for another improper purpose, rather than to pay Mr. Pyatt compensation he was owed in his role as CEO, consultant, or lender.  Furthermore, Premark has presented no evidence that shows Mr. Pyatt authorized the transfer of funds from PlantFuel to himself, as opposed to PFL's board or PFL's CFO authorizing such transfers.  While there is evidence that Mr. Pyatt received payments from unidentified sources through Gusto, Zelle, and by wire and that he received payments from Tasty, Premark has put forth no evidence indicating that these funds were from PlantFuel or were paid from revenue generated from the sale of products that PlantFuel did not pay for.

Regarding the loan agreement between Tasty and PlantFuel, it is true that a loan agreement for which there was no written agreement or repayment plan can weigh in favor of piercing the corporate veil.  *See NetJets Aviation, Inc. v. LHC Commc'ns*, LLC, 537 F.3d 168, 182 (2d Cir. 2008).  However, here, PFL's board of directors entered a written resolution to adopt the loan agreement.  Furthermore, Premark has not presented evidence showing that the revolving loan agreement functioned as a means for Mr. Pyatt to treat PlantFuel's "bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use."  *See id.*  Although Mr. Pyatt was on PFL's board at the time that the loan agreement was approved, he abstained from voting.  Furthermore, as discussed above, Premark fails to show that

13

funds transferred from Tasty to Mr. Pyatt came from PlantFuel or were tied to the loan agreement.

Second, Premark argues that PlantFuel's lack of capital at the time of PlantFuel's formation and PlantFuel's inability to pay Premark demonstrate inadequate capitalization and supports piercing the corporate veil. However, there is evidence of PlantFuel being adequately capitalized. PlantFuel was able to make an initial payment of $1 million toward the Premark purchase orders. Furthermore, PlantFuel apparently had sufficient capital to secure a deal with GNC. Thus, there is evidence that PlantFuel was "capitalized for the undertaking" of entering into an agreement with Premark, *see PXP Producing Co.*, 342 A.3d at 417, which Premark has not disputed. *See also In re Opus E., LLC*, 528 B.R. 30, 59 (Bankr. D. Del. 2015) ("Companies commonly become insolvent, then bankrupt; piercing the corporate veil is an exception reserved for extreme situations, rather than the rule. Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business.") (alteration and citation omitted).

Premark's argument that PlantFuel was inadequately capitalized because it was unable to pay Premark is misplaced. The issue is whether PlantFuel was adequately capitalized for its course of dealing with Premark and not whether it was adequately capitalized after Premark became unable to deliver products and PlantFuel's deal GNC fell through. *See Ayres v. Teleios LS Holdings DE, LLC*, 2026 WL 450701, at *9 (S.D.N.Y. Feb. 17, 2026) ("courts interpreting Delaware law have held that when determining whether a[n] [alleged alter ego company] was adequately capitalized,

14

courts focus on the initial capitalization: whether a corporate entity was or was not set up for financial failure") (internal quotations, alteration, and citation omitted). The Court finds that Premark has failed to prove by a preponderance of the evidence that PlantFuel was initially undercapitalized.

Third, Premark argues that PlantFuel's lack of solvency weighs in favor of piercing the corporate veil. The fact that PlantFuel was unable to pay all of its debts when they became due is insufficient to show that the insolvency prong weighs in favor of an alter ego finding. *See Mason*, 2005 WL 1653954, at *3 (finding plaintiff's argument – that defendant's inability to "meets its obligations as they became due" supports an alter ego finding – "misconstrues the insolvency prong of the alter ego analysis") (internal quotation, alteration, and citation omitted). "Clearly, mere insolvency is not enough to allow piercing of the corporate veil. If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless." *Id.*

Fourth, Premark argues that PlantFuel failed to observe corporate formalities by conducting business in Colorado without registering with the Colorado Secretary of State. However, PlantFuel did not enter delinquent status with the Colorado Secretary of State until July 2023, which is after PlantFuel and Premark's dealings had concluded and the GNC deal had fallen though.

Fifth, Premark argues that PlantFuel's "employees" were not employed by PlantFuel, but rather by PFL or other companies. There is no evidence that Mr. Pyatt was PlantFuel's only employee during the course of dealing with Premark. Rather, the

15

evidence shows that Mr. Miller and Mr. Ivanov were employed by PlantFuel and involved in the Premark deal.  Moreover, even when the GNC deal had fallen through and PlantFuel was falling behind on its payments to Premark, Mr. Pyatt took another employee with him to negotiate with Premark in Texas.  Premark has presented no evidence that these employees were not employees of PlantFuel.  Even if they also worked for other entities, PFL and PlantFuel sharing employees does not support piercing the corporate veil.  It is "well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and directors were not functioning properly."  *In re BH S & B Holdings LLC*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (applying Delaware law).

In sum, Premark has provided no evidence that PlantFuel was inadequately capitalized for the undertaking at issue, that PlantFuel failed to observe corporate formalities, that Mr. Pyatt siphoned PlantFuel funds to himself, or otherwise show that PlantFuel simply functioned as a facade for Mr. Pyatt.  Accordingly, the Court finds that Premark has failed to prove by a preponderance of the evidence that PlantFuel is an alter ego of Mr. Pyatt.

Even if Premark had proved the Delaware alter ego factors, the Court finds that Premark has nevertheless failed to prove the second element of veil piercing under Delaware law, namely, that Mr. Pyatt used PlantFuel to further fraud or injustice against Premark.  *See PXP Producing Co.*, 342 A.3d at 417; *Mason*, 2005 WL 1653954, at *3. As an initial matter, Premark's underlying claims for breach of contract and unjust

16

enrichment are "insufficient to establish the requisite injustice." *See Medtronic Navigation, Inc. v. Saint Louis Univ.,* No. 12-cv-01706-PAB-MJW, 2013 WL 5323307, at *10 (D. Colo. Sept. 23, 2013) (applying Delaware law); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) ("although [defendants'] alleged breach of contract may be unjust or wrongful, the requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim").  Thus, the fact that PlantFuel failed to pay its invoices in full is not, by itself, proof of the second element.  As discussed in more detail regarding Premark's unjust enrichment claim, Premark has presented no evidence showing that Mr. Pyatt retained products sent by Premark.

Premark also argues that unfairness or fraud is shown by Mr. Pyatt's past conduct.  Specifically, Premark argues that Mr. Pyatt's prior company, MusclePharm, being the subject of SEC Cease-and-Desist Proceedings shows that Premark was being used as a vehicle for fraud.  Premark fails to show that Mr. Pyatt's alleged history of fraud constitutes proper evidence under Fed. R. Evid. 404(b) or otherwise has any relevancy to whether Mr. Pyatt used PlantFuel's corporate form to perpetrate fraud against Premark.  Premark provides no argument addressing the Rule 404(b) factors and why Pyatt's prior "bad acts" are admissible.  *See Kertesz v. Korn*, 698 F.3d 89, 91 (2d Cir. 2012) (an "alter-ego claim thus turns on the facts of the owner's operation of the corporation and its relationship to the alleged victim") (applying Delaware law).  Moreover, the SEC matter against MusclePharm did not involve the misconduct that is alleged by Premark in this case.  Rather, the SEC found that Mr. Pyatt failed to ensure

17

sufficient internal controls at MusclePharm that resulted in the failure to disclose to investors the compensation paid to MusclePharm's executive officers, related party transactions, Mr. Pyatt's bankruptcy, and rent expense.  *See* Exhibit A-43, p.2.  By contrast, Premark is not an investor in PlantFuel and Premark has not alleged that PlantFuel made misleading representations.

The evidence shows that PlantFuel ordered products from Premark in order to fulfill PlantFuel's obligations to GNC.  The Court finds that nothing about those facts suggest that PlantFuel or Mr. Pyatt intended to perpetrate fraud.  Premark has not suggested, much less supported, any theory about how or why Mr. Pyatt established PlantFuel as a corporate shell to defraud either GNC or Premark.  For example, Premark offered no evidence that GNC made any payments to PlantFuel or received any Premark products from PlantFuel.  Premark offers no explanation for PlantFuel paying Premark $1 million in connection with its purchase orders if Mr. Pyatt was simply using PlantFuel as a vehicle for self-enrichment.  There was no testimony that the $1 million payment induced Premark to do anything it would have not otherwise done.  And Premark offered no evidence that Mr. Pyatt used or resold any of the products that PlantFuel obtained from Premark but did not pay for.  Finally, although Premark offered evidence of many payments to Mr. Pyatt by PlantFuel and PFL for reasons that Mr. Pyatt could not always recall, the source of the funds was not Premark.  Premark did not pay any money to PlantFuel.  Premark was not an investor who may have been defrauded by a corporate shell, but rather was a supplier who was not fully paid. Premark fails to show that PlantFuel's failure to pay was somehow connected to a fraudulent scheme of Mr. Pyatt.

18

Because Premark fails to show, by a preponderance of the evidence, either element of its claim under Delaware law to pierce the corporate veil, the Court will grant judgment pursuant to Rule 52(c) in favor of Mr. Pyatt and against Premark on Premark's first claim.

### B.  Unjust Enrichment

Premark brings an unjust enrichment claim against Mr. Pyatt in his personal capacity.  Under Colorado law, [4]  an unjust enrichment claim requires a showing of three elements: "(1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 445 (Colo. 2000).  Premark argues that Mr. Pyatt unjustly enriched himself by "requesting, receiving, not rejecting, and maintaining goods and services provided by Premark."  Docket No. 58 at 2. Premark's theory underlying its unjust enrichment claim is that Mr. Pyatt retained the products at issue by maintaining access to the PlantFuel warehouse containing Premark's products, after he had left PlantFuel.

The Court finds that Premark fails to prove by a preponderance of the evidence that Mr. Pyatt in his personal capacity received a benefit by retaining Premark's products.  Premark presented no evidence that the products are stored in a PlantFuel warehouse or that Mr. Pyatt had access to that warehouse following his departure from PlantFuel.  The only evidence presented by Premark is that Mr. Pyatt participated in the

---

[4] Colorado law applies to Premark's unjust enrichment claim.  *See* Docket No. 65 at 9.  Premark bears the burden of establishing by a preponderance of the evidence its claim for unjust enrichment under Colorado law.  *See* Colo. Rev. Stat. § 13-25-127(1).

process of ordering products from Premark while he was employed by PlantFuel and that, as the CEO of PlantFuel, he presumably had access to the stored Premark products after they were sent to PlantFuel. But Premark offered no evidence that Mr. Pyatt possessed Premark's products in his personal capacity at any point, but particularly after he left PlantFuel. And there is no evidence that Mr. Pyatt (or any other employee of PlantFuel or PFL) caused the sale of the Premark products that PlantFuel did not pay for and somehow diverted that money to Mr. Pyatt. Thus, considering all of the evidence as a whole, the Court finds that Premark fails to prove by a preponderance of the evidence any of the elements of unjust enrichment. *Cf. Powers v. Emcon Assocs., Inc.*, No. 14-cv-03006-KMT, 2016 WL 1111708, at *4 (D. Colo. Mar. 22, 2016) (finding that plaintiffs "failed to set forth a viable claim of unjust enrichment against the individual Defendants" because "Plaintiffs do not set forth any allegations indicating the individual Defendants benefitted, unjustly or otherwise, in an individual capacity from Plaintiff[s'] . . . work and/or employment") (applying Colorado law); *Residential Fences Corp. v. Rhino Blades, Inc.*, 2025 WL 583323, at *4 (2d Cir. Feb. 24, 2025) (to prevail on its claim for unjust enrichment against the individual defendants, the plaintiff must demonstrate that the corporate veil may be pierced or that the individual defendants "received a benefit separate and apart from their roles as owners or employees") (applying New York law).

Because Premark fails to prove its unjust enrichment claim by a preponderance of the evidence, the Court will grant judgment for Mr. Pyatt and against Premark on Premark's second claim pursuant to Rule 52(c).

### III.    CONCLUSION

Therefore, it is

**ORDERED** that Mr. Pyatt's oral motion for judgment pursuant to Rule 52(c) is

**GRANTED**.  It is further

**ORDERED** that judgment on Premark's claims shall enter in favor of Mr. Pyatt

and against Premark.

DATED June 2, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge